Good morning, Your Honors. Roman Silberfeld for the Plaintiff and the Appellant. With the Court's permission, I'd like to reserve three minutes for rebuttal. This case concerns the complex system of drug regulation in this country. That system failed in this case. It failed because Merck failed to properly test and warn about the effects of its drug, Zocor. And as a result, a wonderful young man is dead, a bright legal career is extinguished, and a family is shattered. Now, the proper functioning of the drug regulation system requires a manufacturer to first study and test the potential effects of its product. It then requires that those results be reported to the federal authorities, namely the FDA. Maybe I can – the briefing from both sides is a little bit confusing, I think, from the standpoint about the failure to test. Can you please state your position – well, state your argument on Merck's alleged failure to test as it relates to the failure to warn claim? Certainly. I don't know how to pronounce your client's name, did I? Latiolais. Latiolais? Yes. Okay, thank you. In order to properly warn, which is, in fact, the second step in the process, there has to be a proper study and testing of the potential effects of the drug. Our claim is twofold, but they're linked. The twofold claim is that Merck, by its conduct and by its own admission, excluded from the study population people who were at risk for the very indication or the very problem, namely psychic disturbances, that we say was the result of the taking of the drug in this case. So the failure to include the right population, the right at-risk group, led to a reporting to FDA that didn't include that information because Merck made the decision to exclude that population from the study group, the test group. As a result, it failed to warn because there was nothing to warn about because the results from the at-risk group were not included in the study information that was provided. So the failure to test and the failure to warn are not independent. They're linked. So now the Valentine case says there's no independent duty to test. And as I understand Valentine, it's saying that the manufacturer doesn't have an obligation to go out and develop new information that isn't otherwise available. And so when I look at Dr. Golombis, is that her name? Golomb. Golomb. And I say, well, is this the prevailing knowledge or the best available knowledge? And there isn't any indication of that in her affidavit or her testimony. It seems it's speculative. It's things that could be found if more testing had been done. So why doesn't that fail under this Valentine standard that the manufacturer has no obligation to go out and develop new information that's not part of the best prevailing medical knowledge at the time? Several reasons. First, Valentine is unique in terms of its procedural posture. Valentine was a case that was tried twice. In the first trial, the jury found for the manufacturer on the failure to warn claim, leaving a possible testing claim and a design claim for the second trial. And the language that Your Honor has referred us to, that is that there's no independent testing claim or independent claim to go out and design or test further, relates to the fact that the jury had already found, the trial court in that case had already found, that the failure to warn claim failed. What we are saying is that those two claims, the failure to properly test, is linked to the failure to properly warn. Now, the evidence in the case is not limited to simply Dr. Golomb. The evidence in the record is that statins, the class of drugs that Zocor is in, have been associated in the literature with psychic disturbances and suicide prior to the time that this incident occurred, prior to the time that this drug was prescribed. And in fact, the pre-market lack of information that Merck provided to FDA is in sharp contrast to the post-market information. After the drug was out in the marketplace, there were nearly 2,000 adverse reaction reports that Merck received relating to psychic disturbances and 24 suicide attempts. And so that's the linkage. We are not in a Valentine situation in that there has not been a trial where there has been a finding affirmed on appeal that the failure to warn claim is gone. You brought up the FDA's involvement. There's this YFB case now pending. Do we need to hold this case to wait and see what the Supreme Court says on FDA preemption of the state, the state claims, for claims? Well, certainly the decision there may provide some guidance as to whether, as a practical matter, there is a claim here going forward. I have my own views as to what the Supreme Court is likely to do with that, or at least what I hope the Supreme Court will do with that. But in terms of holding this, I think that this Court can decide this on the narrow question before it, namely, was the summary judgment here improvidently granted? We clearly think it was, based upon the testimony of Dr. Oppenheim, that I'd like to get to. But I think that narrow question can be answered. The case can be sent back. And by then, perhaps by next June, we'll have a decision in Levine v. Wyeth. Let me ask you about Dr. Oppenheim. Sure. I mean, obviously this, you know, we're dealing with the legal issues here, and obviously this is a truly tragic situation, but we have to focus on the legal issues. Assuming that Dr. Oppenheim's testimony was equivocal regarding how he would have treated Davis differently, given a suicide risk warning, specifically that he would have further discussed suicide with Davis, why can't the Court conclude that Dr. Oppenheim still would have prescribed the Zocor to Davis, based on Davis's indication to Dr. Jones and Therapist Elliott that he was not suicidal? I think that a trier of fact at a full trial might reach that conclusion. But I don't think the district court in this case, on summary judgment, could weigh the evidence, as the Court indicated in the last argument, can weigh the evidence and reach that conclusion here. Modus is clear. Okay. So I guess what you're saying is, all right, those two doctors, he reported to those two doctors that he was not suicidal. So how would I be weighing the evidence that he's not suicidal and that he was suicidal? I mean, he obviously committed suicide, so we have that. But what would I be weighing if I came to that conclusion? The sole inquiry needs to be whether the testimony of Dr. Oppenheim was or was not equivocal. I don't think there's any doubt but that the answer to a question that says, and this is at page 28 of our opening brief, I'm referring to Dr. Oppenheim's testimony, when he says, maybe, in answer to the question, would it have made a difference, he says, maybe. And then he says, depending on what I heard from him, namely the patient. But he wasn't answering the question, would you prescribe it, would you still prescribe it? He was answering the question, would you alert him to a black box warning? But we don't really have any evidence that a black box warning would have been presented. Actually, Your Honor, he did answer the question of whether he would have prescribed it. He said the question was, but in Mr. Davis's case, if there was that black box warning, which, by the way, Dr. Oppenheim raised as a possibility in his prior answer, certainly you would have alerted them, should have been him, to what was in the black box warning when you would have prescribed in any event. And his answer was, maybe, depending upon what he heard from the patient. Right, but the question and answer right before that was, even if there was a black box warning, you would tell them, but would you still prescribe it? And he says, yes. And then he says, well, but would you have alerted him to what was in the black box warning when you would have prescribed it in any event? And he said, maybe. So he wasn't even saying, yes, he would definitely have alerted him to the warning. He was saying, maybe I would have alerted him to the warning, but that doesn't go to whether he would prescribe it or not, as I read those four questions together. Well, I think taken as a whole, there's enough there in terms of being equivocal and not meeting the standard and modus where the physician unequivocally said no to the question of would you have warned, unequivocally said no to the question of did you see the product literature, unequivocally said no, he didn't rely on any information from the manufacturer in making his prescribing decision. Here, Dr. Oppenheim, who has behind him a somewhat elegant system at Kaiser that evaluates drug effects, this is that panel that works at Kaiser, they're pharmacologists, pharmacists, and physicians, who then report out to the physician population the drug effects that they become aware of. So it isn't a matter that Dr. Oppenheim even saw a package insert. He relied on this drug panel at Kaiser to inform him about the drug's effects. And his answer, unprompted by anybody, was maybe it would have made a difference, depending upon what he heard from the patient. For purposes of summary judgment, that's enough. And the district court concluded, in fact, he took this testimony to read the exact opposite, that his testimony was unequivocal and certain, and there's certainly nothing in that language that would suggest that. Now, Dr. Gallam's testimony had information about the reduction in serotonin potentially being correlated to suicide, and you said there was other information in the record to that effect. What's the evidence linking in the record, linking that testimony or report to the likelihood or the possibility that FDA would make a black box warning? The black box warning information that's in the record is simply an example of a heightened warning that's available. There is nothing to indicate in this record that had the FDA known about the effects of statins in terms of psychic disturbance that a black box warning would have issued. The point simply was that a level of warning, black box being one, had it been given to the physician, may have, in the words of Dr. Oppenheim, may have made a difference in his prescribing decision. That was the only purpose of that particular piece of information. You're down to a little less than three minutes. Do you want to reserve? I would like to reserve, actually. Okay, thank you. Thank you. May it please the Court, Hall Marston on behalf of Merck, the appellee. I think that the colloquy with counsel has hit a very important nail on the head, which, with the Court's permission, I'd like to explore a little bit. The luxury of this case is a relatively narrow set of facts and a controlling opinion in modus. If there is one thing that the Ninth Circuit and Judge Matz made absolutely clear in modus, is that the focus here has to be on the prescribing behavior of the prescribing physician, in this case Dr. Oppenheim. In fact, in modus, if the Court goes back and looks at page 997 of the district court opinion, you'll see that Judge Matz juxtaposes a question that wasn't asked, that is the question about prescribing behavior, with a question that was asked about counseling behavior. The passage of Dr. Oppenheim's testimony that the Court and counsel were discussing is clearly, in the last sentence, addressed to counseling behavior. It would be a fanciful characterization to read this question, which reads, question, but in Mr. Davis's case, if there was a black box warning, certainly you would have alerted him to what was in the black box warning, when you would have prescribed in any event. How could that question be more clear in differentiating, on the one hand, the counseling function of discussing with the patient, and the prescribing function of actually prescribing the therapy for the patient? And in response to that, which is a question about counseling, not about prescribing, because it says, would have prescribed in any event, what does Dr. Oppenheim say? He says, maybe, referring to the counseling behavior, depending on what I heard from him. But can we infer from that, let's say, so maybe, then they have a conversation, and Davis says, yes, I'm suicidal, I think about it every day, I've tried it before. You're saying that he would have made the same decision? No, Your Honor, you can't, because there's no evidence in the record of that predicate that you just inserted in your question, namely, that had there been a conversation between Mr. Davis and Dr. Oppenheim about Mr. Davis' emotional state, that Mr. Davis, on further poking, to use a colloquial phrase, Your Honor, would have disclosed this. Why? Because during that interview, when Zocor was prescribed, Dr. Oppenheim's attention was drawn to a question that he filled out on the questionnaire. I'm depressed, I'm stressed. And Dr. Oppenheim testified that I talked with the decedent about that. And the decedent came back and said, no, I am not depressed, I am stressed because of my work situation, my job situation. So can we draw the inference question that I understood the court to be posing is precluded by the other evidence in the record that they had that conversation about his emotional state, and the decedent reported that I am not depressed. And further, Your Honor, it would be wholly speculative to draw that inference in light of the timeline. Recall, March of 2003 is the consultation with Dr. Oppenheim and the prescription. December 2004, treatment with Natasha Elliott, the therapist from Kaiser. Later December 2004, the consultation with Dr. Sharon Jones, a psychiatrist certainly much better equipped to assess the suicidal risk than Dr. Oppenheim. Both Ms. Elliott and Dr. Jones conclude after roughly nine months of therapy with Zocor that this patient is not at risk. And so the point of going through that factual narrative, Your Honor, is to say that based on this record, Judge Falzer was absolutely right to not draw an inference from maybe for two reasons. One, because the testimony itself is not susceptible to that construction in light of the fact that it's asking about counseling behavior and not prescribing behavior. But secondly, the other evidence in the record about the decedent's reports of his interior state do not give rise to the possibility that upon further inquiry by Dr. Oppenheim in March of 2003, the decedent would have said anything different. Well, now, that I think, I just don't, I can't follow you on that one. Because obviously from the standpoint that, I mean, a person could say the day before, you could ask them, are you going to commit suicide? And they'd commit suicide the next day. Well, obviously in hindsight they probably had some, you know, I don't know, maybe it popped in, I mean, whether you commit suicide, I mean, the only time we know whether someone's really suicidal is at the moment that they do it. But it's hard for me to say that just because on two different times someone said that they're not. Well, Your Honor, I understand the logic of the court's question. But with apologies, that kind of question discounts the expertise that Dr. Jones and Ms. Elliott developed over a career of their professional lives. It is their job to assess on the basis of the standards of their medical practice and discipline to determine whether a person is suicidal. Were one to, were one... Well, I think, but they obviously weren't right. But, but you're... Even, even if it has nothing to do with the ZOCAR, ZOCOR, I mean, how right could they be when someone, you know, commits suicide pretty quickly after having said they're not suicidal? Well, Your Honor, it is equally plausible as a matter of logic that the conviction in Mr. Davis to commit suicide arose after he consulted with Dr. Jones and that Dr. Jones was correct. But the logical requirement, Your Honor, of the court's, the premise of the court's question is that out of every suicide, it then becomes incumbent to look retrospectively at the life of the... Right. And then try to conjure up causes, notwithstanding the fact that during a particular interval, the decedent told all the medical professionals around him that he was neither depressed and the medical professional best suited to assess his interior state and emotional health, Dr. Jones, a psychiatrist, concluded that he wasn't at risk. In particular, in prescribing a medication that does have a concern about suicidal tendencies, the Restorol that he was prescribed for insomnia when he saw Dr. Jones in late December of 2000...2004. I'm sorry, 2003. So I guess the challenge that I think the court's question poses is that the... to what the potential dynamic here going on in the decedent was at the time, even though medical professionals... I was struck by Your Honor's comment in one of the earlier arguments. The medical professionals are looking Mr. Davis right in the face. Of course, we're not. And those medical professionals testify this person in our best assessment is not at risk. It is like so much of the plaintiff's case here that it depends upon all of these speculative leaps of faith. Take, for example, this conversation that the court had with counsel about the black box warning. There is, of course, the element of speculation as to whether or not the FDA would ever in a million years have indicated that there was a need for a black box warning. And, of course, in post-market surveillance, Merck, like any other responsible company, reports post-marketing activity to the FDA as adverse drug reports. But that being said, what is this black box warning going to say? We have no idea. What would the... So we don't know, one, if the FDA would have permitted a black box warning. And I want to address Your Honor's questions about the regulatory dynamic here. Second, we don't know whatever this black box warning would say. And even if you give Dr. Gollum's testimony total full boat, being reminded of your comment about not weighing evidence, Dr. Gollum doesn't close the door on causation. So, you see, one cannot avoid the dual-pronged burden that the plaintiff carries here. The plaintiff must not only show that the warning itself is deficient. Where's that black box? Okay. We don't know if there would be a black box. We don't know what the black box would say. We don't know the impact of the black box on the professionals, on Dr. Oppenheimer. But then you have to get to close the door on causation as well. So you have to have a defective or inadequate warning, and you have to show that that warning caused the injury to the, in this case, to the plaintiff through the decedent. And what does Dr. Gollum say? She says only that such a hypothetical warning, for which we don't know if we would have regulatory approval. I want to make sure I'm precise here. I think she only says, quite possibly, would have saved his life. Well, in terms of Dr. Oppenheim saying, unequivocally, I never read the warnings. I never got information from Merck. I relied on information from a board of clinical pharmacists working with medical specialists. And even if I had been told that there was a black box warning, it would have affected only my counseling behavior, and not my prescribing behavior. I would have spoken with him further. Well, he doesn't say it as clearly as you're saying it. Your Honor, if you'll forgive me, I think he does. The question is, well, on what point, if I may, Your Honor, it's clear that he didn't read the inserts, right? Well, he doesn't say it only affected my counseling behavior and not my prescribing behavior. Well, he did not use that language, agreed, Your Honor, but he is asked the question. But in Mr. Davis' case, if there was that black box warning, certainly you would have alerted him to what was in the black box warning when you would have prescribed him in any event. I agree, Your Honor. Perhaps the question was not put in the same kind of legalese that I might, but certainly the phrase would have alerted him to what was in the black box warning is the counseling function, and when you would have prescribed in any event is the prescribing behavior. And that's really, I think, Your Honor, is so important, particularly about the district court opinion in the Motus case, because over and over again, Judge Matz makes it clear that what we're talking about here is prescribing behavior, because Dr. Trostler, who was the prescribing physician in the Motus case, did talk about what his counseling behavior would have been, and the counseling behavior in that context did not raise a tribal issue of fact sufficient to defeat a motion for summary judgment. Well, Motus, that guy doesn't read anything, right? I mean, he wouldn't read anything. Dr. Trostler? In Motus, in the Motus case. Right, he did not read the package inserts. And he never reads them. I think that's what he said. I do not rely on him. There's no evidence here, by the way, that Dr. Oppenheim reads package inserts. Instead, he relies upon the information given to him by the Kaiser Panel of Clinical Pharmacists consulting with other medical specialists. So the Motus case, I think, I feel that the court has a luxury here in having the Motus case  Trostler didn't read the package inserts. Apparently, Dr. Oppenheim didn't read the package inserts and relied on the information from the Kaiser staff and the careful delineation between counseling and prescribing behavior. And Judge Fauser, in her order, followed Motus closely and went to the same issue of the difference between the two. She says, three times, Dr. Oppenheimer said, I would prescribe this drug. So we have no positive link between the warnings and the prescription. We have no evidence in terms of the deficiency of the warnings because the black box is, one, uncertain as to regulatory approval, and, two, certainly uncertain as to what its contents would be. As Mr. Selberfan acknowledged in his colloquy with the court, we don't know what the contents of it would be. Well, if we don't know what the contents would be, I would submit, how can the court conclude that a tribal issue of fact is raised as to the causative effect of an unarticulated black box warning would have been on Dr. Oppenheim, who has already said that this hypothetical would only change his counseling behavior. Can you also advise us whether you think the case needs to be held for the result of Wyeth v. Levine? Well, ordinarily I wouldn't embarrass myself by saying I'm not entirely familiar with all the issues in the Wyeth case. Preemption was not an issue that was raised in the context of the underlying summary judgment proceeding. Using the typical appellate requirement that issues preserved are those issues which are litigated below, with the possible caveat that a sole and exclusive question of law may fall outside that rule, I would say no. I would say it would not be appropriate to forestall a decision in this case based upon the issues in the Supreme Court case. But I would also like to raise just for a minute. You're just about out of time. Then I will say I appreciate the court's questions and their attention. And on behalf of Merkel Smith. Thank you. What we heard, I think, was an interesting spin on now the difference between prescribing and counseling. And I think the court's questions picked that up. There is nothing in this record to suggest that there was anything going on in the conversation between Mr. Davis and Dr. Oppenheim, other than Dr. Oppenheim making a prescribing decision. There's no counseling going on. He was trying to decide what drug to give, in what dose. But did you take this deposition? Who took this deposition? Lawyers other than Mr. Marston and I. But they only asked whether he would have alerted the decedent as to any black box warning. They never asked the question, would you have changed your prescription anyway? They didn't ask that question. Well, I suppose, Your Honor, that the answer to that question really depends upon whether you think maybe, the answer maybe refers to the prescribing decision or the warning decision about a black box warning. Because taken in its entirety, taken in its entirety, the question was asked a number of times about whether or not Dr. Oppenheim would prescribe in the face of a warning. At page 27 of our opening brief, and this is the excerpt from Dr. Oppenheim's testimony, he was asked if there was a warning, would you have prescribed it anyway? He does not say yes. What he says is, well, let me back up for a second. And then he goes into a discussion about the black box warnings that were issued for SSRIs last year. And he goes on to say, there's enough concern that they felt the FDA, the physicians should know about it and inform their patients. And he goes on to say. So he doesn't answer the question. Well, but he doesn't say, as Dr. Prossler said in modus, he does not unequivocally say yes. But he doesn't even say maybe in response to that question. He says the patient would be informed. And, you know, some parameters. And I, you know, I didn't make this up. This is just what the witness said. Some parameters to let us know if there were any problems. I don't know what else she would do. Then the follow up question. Well, would you still prescribe it? And his answer is, yeah, if. So he does say yes. No, he says, yeah. But he continues, if there were not risk factors, if they weren't depressed, you might take a more detailed history about the possibility. And then he goes on with the maybe answer. So you're saying that the yeah there, that's transcribed Y-E-A-H, does not mean yes, but it's just like a, you know, an um or something? I don't really know. But I don't think you can take that one word as being the totality of the answer, because it then goes on to talk about risk factors and so forth. So the yeah, whether it means yes or something else, is incomplete if the rest of the answer is not considered. But the guidance that MODIS gives is simply this. Summary judgment should not be granted if the testimony on the key point is equivocal or uncertain. These answers to these questions are at best equivocal and uncertain. And the district court simply overstepped when it granted summary judgment here. All right. Your time is up as well. Thank you both. Thank you. This matter was being submitted. Thank you, Your Honor. Thank you. Gary Davis versus Chase Bank.
judges: Callahan, Ikuta, Shubb